Filed 7/17/26  P. v. Nisbet CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084770 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD295935) |
| v. | |
| JOSEPH WILLIAM NISBET, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed; remanded with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Senior Assistant Attorney General, Christine Levingston Bergman and A. Natasha Cortina, Deputy Attorneys General for Plaintiff and Respondent.

After a drive-by shooting resulted in the death of Tre'Von Stewart-Jordan, a jury convicted appellant Joseph William Nisbet of first-degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and conspiracy to commit murder (§ 182, subd. (a)(1); count 2), and found true the special circumstance that appellant committed the murder by shooting from a vehicle. (§ 190.2, subd. (a)(21).) At a bifurcated hearing the court found true that appellant committed murder while an active participant in a criminal street gang (§ 190.2, subd. (a)(22)), committed the crimes for the benefit of a criminal street gang with the intent to promote and assist criminal conduct by gang members (§ 186.22, subd. (b)(1), (4), (5)) and personally and intentionally discharged a firearm from a motor vehicle causing death (§§ 12022.53, subds. (d) & (e)(1), 26100, subd. (c)). He was sentenced to life without the possibility of parole on count 1, plus 25 years to life for discharging the firearm from a vehicle causing death. A sentence of 25 years to life was imposed but stayed on count 2 pursuant to section 654.

On appeal appellant contends that the trial court erred when it: (1) excluded a text message appellant sent to a police detective two days after the murder in which appellant asserted he was afraid people in the gang believed he was a "snitch," (2) concluded that the evidence sufficiently established at least two predicate offenses to qualify the East Dago Mob Crips (EDMC) as a "criminal street gang" for purposes of the gang enhancement and special circumstances, and (3) failed to order fines and fees at sentencing, though amounts are reflected in the minute order and abstract of judgment.

---

[1] Undesignated statutory references are to the Penal Code.

We conclude the court did not abuse its discretion in excluding the post-shooting text message. Neither the state of mind exception to hearsay nor the rule of completeness required its admission.

We also conclude there was substantial evidence that at least two offenses offered by the People actually provided a common benefit to the gang that was more than reputational and thus qualified as predicates to establish EDMC as a criminal street gang.

The People concede that the case should be remanded for the court to remedy its failure to order fines and fees, and the concession is well taken.

We affirm the judgment and remand for resentencing on the fines and fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *EDMC*

EDMC was a San Diego gang that claimed as its "turf" the 4400 block of City Heights, between 44th Street and 47th Street, bounded to the east and west by the 15 and 94 freeways. EDMC's allies included the Neighborhood Crips and the West Coast Crips.

The rivals of EDMC and the Neighborhood Crips were various Blood gang sets, which included the Lincoln Park Bloods, Skyline Piru, O'Farrell Park, and 5-9 Brims.

Appellant had numerous EDMC-related tattoos on his body, including the words "East Dago" covering his throat. He had tattoos depicting images symbolic of the numbers four, 44, and the 40's, which a police detective explained referenced EDMC territory along 44th Street. These tattoos included "44" on appellant's arm, a Milwaukee Brewers glove showing four fingers, and an Audi symbol with its four circles. He had a tattoo reading "OTF" that stood for "On the Forties." Appellant also had tattoos showing

3

street locations–4400 Home Avenue and 2300 Fairmont Avenue–that lay within EDMC territory. He was captured in photos showing hand signals associated with EDMC. A gang detective expressed the opinion that appellant was a member of EDMC.

In 2020, appellant was arrested for burglary. He became a paid confidential informant for the San Diego Police Department (SDPD). He was initially assigned to Detective Andrew Longen, then in February 2021, appellant was transferred to Detective Jonathan Bamba. Appellant supplied information to Bamba via text messages and in face-to-face conversations that were audio recorded. Appellant was deactivated as an informant in October 2022, after he was arrested for the murder of Stewart-Jordan. Appellant received $4,820 for information that he provided about gang activity in San Diego County.

## II. *EDMC's Use of Firearms*

Trial evidence established that EDMC used firearms for a variety of gang-related purposes, including retaliation against rivals and protecting their turf. The jury heard that Haben Haile and two others shot and killed someone at a hangout for 5-9 Brims to retaliate for the removal of a "homie's" headstone. Haile and E.W. were identified as among the "top shooters" for the Crips. After the killing of the 5-9 Brim, Crips were waiting for Brims to hunt them down, and Halie and Stephen Pittman were also "rolling" and looking for Brims.[2]

---

[2]     The gang detective explained that "rolling" means "everyone getting into a vehicle of some kind and hunting or looking for a rival—rival gang member to shoot."

In June, EDMC had acquired six firearms via a recent burglary. Two of the guns were fully automatic assault rifles. The guns were being stored at Pittman's house. Haile was involved in the burglary, as was Rashad Massey, who was an EDMC member. Haile and Massey were pulled over by the police and found to have guns and stolen purses in the car.

Appellant said "homies [were] using guns and then, just selling 'em . . . to other homies." "[T]hey should be getting rid of 'em," but instead "guns are being passed around just like circling circling."

In June 2022, EDMC member Phillip McCoy was shot in Texas while trying to buy a firearm. At the candlelight vigil for McCoy, appellant armed himself with an assault rifle and conducted patrol to ensure no one would "try to do some weird shit and kick candles over." "I'm, like, out here sitting alone with this [assault rifle] watching cars," he told his girlfriend, Tambrisha Jones,[3] and complained that nobody else was paying attention. "I'll be damned if we get caught slippin," he said. But he offered to "pass[ ] this blower[4] to someone else" if Jones would bring their daughter and join him.

In early July 2022, appellant got pulled over by the police while driving his white Suzuki SUV. Appellant texted Jones during the traffic stop and told her he was not getting "locked up" but should have been because in the car there was "[a] blower, LOL." But the police did not search the vehicle.

Toward the end of July, when appellant learned that Haile had "blowers" for sale, he asked him to "[t]oss me one, cuz. LOL. I'm down bad,

---

[3]     Jones was arrested during the investigation of the murder of Stewart-Jordan.

[4]     The gang detective testified that "blower" is a common street term for a firearm.

5

dead homies, and I need one on my mom.  LOL.  We can do a payment plan or something."  Haile agreed to let appellant have a firearm and pay for it when he got the funds.

III. *EDMC Called for Retaliation After Joseph Curtis's Death*

Around 9:40 a.m. on August 12, 2022, EDMC member Joseph Curtis was shot and killed at a gas station in La Mesa.  A few hours later, officers at the scene observed appellant and another person taking photos of the murder scene.  Appellant later posted a video from the murder scene on social media.

On the same day at around 1:15 p.m., jail calls reflect that appellant and others informed Richard Bell, an EDMC member who was then in jail, that they had just "lost another homie."  They explained Brim Bloods had murdered Curtis at a gas station.  Bell demanded, "something gotta happen bro.  That's a response.  There's gotta be a response to that.  We couldn't respond to [McCoy's murder in Texas] bro, but, come on cuz.  There's gotta be a response to that."  Bell insisted, "Y'all need to let it be known.  If you ain't ready for this, beat it now.  Just leave. . . . We're not doing candle lights and all that, just that pretty shit.  N*[5], that's not what we're doing . . . ."  To "the rest of the n* that stay.  Y'all know what time it is, bro, and just be smart.  Use your head, on the dead homies."

To appellant directly, Bell said, "This is our hood . . . this ain't no West Coast shit. . . .  This is [EDMC] mob shit. . . .  You always in every fucking music video. . . .  N* ready to get in the car with West Coast. . . . you need to get in the car with us, n*.  Let's go."  An SDPD gang investigator interpreted this to mean that appellant "was getting in the car with West Coast [gang] to

---

[5]     The original messages used a racial epithet.  The term is indicated herein as "n*."

commit crimes, and it was time for him to get in the car with East Dago Mob," although it could also mean appellant was spending too much time making music videos and not enough time working with EDMC. Around 2:43 p.m. that same day, Bell spoke with appellant and the son of shooting victim Curtis. Bell consoled the son and assured him that they were going to "make some shit shake" and "We finna make something happen, that's for sure."

Appellant complained that one member had gone home because he was not ready "for this shit," but he assured Bell, "They getting all the real ones, man. Just like cuz said, all the real ones going down or they out of here."

IV. *Multiple Shooters in a Mitsubishi Murdered Stewart-Jordan*

Around 5:30 p.m. that evening, surveillance video captured appellant in his white Suzuki SUV driving into the garage of a rental car facility near the airport. He drove out of the facility and stopped around the corner. A passenger got out of his vehicle. The passenger, later identified as E.W., walked back to the rental car company and continued through the building. He got into a black Mitsubishi Mirage G4 (Mitsubishi) in the rental car lot and drove out of the lot at around 5:45 p.m.

Jones worked at the rental car company. She was at the exit gate at the rental car facility from approximately 5:38 p.m. to 6:40 p.m. that day. Her log for that time period does not show that the Mitsubishi was ever logged out. Appellant exchanged numerous messages via Snapchat with Jones between 5:08 p.m. and 10:00 p.m.

Around 9:13 p.m., surveillance footage showed the Mitsubishi turning into an apartment complex that was a hangout of the Lincoln Park Bloods, allies of the 5-9 Brims. In the parking lot of the apartment complex, four people were standing by a Jeep Cherokee, and Stewart-Jordan was walking

toward the entrance of the parking area. He wore a red shirt, the color associated with Bloods.

The Mitsubishi entered the parking lot and drove past Stewart-Jordan. At least five flashes of gunfire erupted from the vehicle's rear driver's side window. As the Mitsubishi continued further into the parking lot, ten shots came from the front right passenger window, directed at the group by the Jeep.

The Mitsubishi did a three-point turn and headed back toward the entrance where Stewart-Jordan lay on the ground. When the vehicle passed Stewart-Jordan, two additional gunshots came from the rear passenger window.

Stewart-Jordan suffered gunshot wounds to his abdomen, sternum, jaw, wrist, forearm, and thighs. He was pronounced dead at the hospital. The cause of death was gunshot wound of the torso.

Police recovered 30 bullet casings from the scene of the shooting. A forensic firearm examiner determined that the casings came from three different nine-millimeter-caliber firearms.

V. *Appellant Initiates Contact with Bamba*

Around 10:38 p.m. on August 12, 2022, the day of both murders, appellant texted Bamba, inquiring "What the hell is going on out here, bro?" Bamba responded: "It's craziness. Might want to stay out the way for a little bit, JoJo. You got anything, though?" Appellant answered that he was staying out of the way but would look into it.

Bamba expressed his concern that the murder of Curtis "is going to set off some more violence" because EDMC likely believed Curtis was killed "by some Bloods." Appellant agreed and sent Bamba a social media post by a Brim gang member claiming credit for the shooting and killing of Curtis.

8

Appellant said if he heard anything about the shooting "that just happened" (*i.e.*, the Stewart-Jordan drive-by shooting that occurred just over an hour earlier), he would let Bamba know "ASAP." Bamba said the Stewart-Jordan killing was "way too soon after the murder [of Curtis] to be a coincidence, I think." Bamba warned appellant to "stay inside for a little bit." Appellant replied: "I don't . . . got time for this shit. I got my baby girl to live for. Be safe out there, man. Just thought I'd get in touch with all that happened today." Appellant then said, "I have info on Bahia [Hotel] shooting, though, if you want to talk tomorrow or meet up soon." Bamba told appellant to gather the information and the detective would be in touch.

Two days after the shooting, in their very next communication, appellant sent a text message to Bamba that appellant unsuccessfully moved to admit at trial, exclusion of which he challenges on appeal (post-shooting text). Appellant wrote: "Everyone is acting weird towards me still lately. I feel like they have been trying to find out if I'm a snitch or not. They don't talk about certain stuff around me and do certain things around me anymore. They don't invite me places, nothing. I have to ask. And then people act dumb or like they don't know what I'm talking about."

VI. *Investigation Connected Appellant to the Mitsubishi*

In addition to collecting surveillance footage from the rental car facility, the apartment complex, and nearby businesses, on August 28, 2022, officers located the abandoned Mitsubishi. Its driver's side window was broken and both front and rear license plates were missing. Police found in the Mitsubishi a single bullet casing that matched some of the casings found at the scene of the drive-by shooting.

A white residue covered parts of the interior of the car, as if a cleaning fluid had been poured inside. SDPD criminalists were nonetheless able to

9

recover DNA from the Mitsubishi's front passenger door panel and buttons, the vehicle's center console, and the rear passenger door and door lock.

Appellant's DNA was a likely match for the samples from the front passenger door panel and buttons. E.W., the passenger identified exiting appellant's vehicle outside the rental car facility, was a likely match for the samples from the center console of the Mitsubishi. The rear passenger door and lock button had a three-person mixture of DNA. Appellant was one of the three likely contributors to that mix.

The jury found appellant guilty of first-degree murder and conspiracy to commit murder and found true the special circumstance that appellant committed the murder by shooting from a vehicle. (§ 190.2, subd. (a)(21).)

This appeal followed.

## DISCUSSION

### I. *Exclusion of Post-shooting Text Message*

Appellant contends the trial court abused its discretion in excluding the post-shooting text message to Bamba. Because the message was irrelevant, neither the state of mind exception to hearsay nor the rule of completeness required its admission. We find no abuse of discretion.

### A. *Additional Background*

Appellant argues his post-shooting text message continued a conversation he was having with Bamba, and, alternately, was not hearsay offered for the truth but as evidence of his state of mind.

As discussed above, on August 12, 2022, appellant initiated contact with Bamba and asked, "What the hell is going on out here bro." The two speculated that there would be retaliation, then appellant offered, "but if I hear anything about the shooting that just happened I will get the info to u asap." He volunteered that he had information about a shooting at the Bahia

hotel "if u want to talk tomorrow or meet up soon."  Bamba said "Gather your info, and I'll be in touch" and "You be safe too," to which appellant responded "Okay" in the last message sent that night at 11:12 p.m.

There were no messages between them on August 13, 2022.  On August 14, appellant texted "yap," indicating he wanted to communicate with Bamba.  Appellant then sent the post-shooting text explaining that others were "acting weird" towards him and he felt they were trying to find out of he was a snitch.

The court concluded that the post-shooting text was not admissible under the rule of completeness because it occurred two days later and did not respond to what Bamba had said in the last message.  The court described the text as a "self-serving statement from the accused" and found the state of mind exception inapplicable.

B.  *Legal Principles*

1.  *Rule of Completeness*

Evidence Code section 356 is known as California's "statutory version of the common law rule of completeness."  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 269, fn. 3 (*Parrish*).)  "The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Evidence Cose section 356 "is founded not on reliability but on fairness" and precludes one party from using " 'selected aspects of a conversation, act,

11

declaration, or writing, so as to create a misleading impression on the subjects addressed.' " (*Parrish, supra,* 152 Cal.App.4th at pp. 273–274.) "In other words, reliability of the evidence is not a factor in determining admissibility under the rule of completeness—indeed, the evidence proffered by the defendant and the prosecution may both be unreliable." (*Ibid.*)

However, Evidence Code section 356 " 'is indisputably " 'subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced.' " [Citations.] "The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . ." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 605.) The statute allows inquiry into otherwise inadmissible matter only when it relates to the same subject and is necessary to make the already introduced conversation understood. (*People v. Gambos* (1970) 5 Cal.App.3d 187, 192.)

2. *State of Mind Hearsay Exception*

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (*Id.*, subd. (b).) Evidence Code section 1250 outlines an exception to the hearsay rule for statements that are offered to prove the declarant's state of mind. But even if this exception applies, the statement is nonetheless inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.)

In some cases, statements can be admitted "as nonhearsay circumstantial evidence of a declarant's state of mind." (*People v. Clark* (2016) 63 Cal.4th 522, 591.) These are " '[s]tatements that do not

directly declare a mental or emotional state, but are merely circumstantial evidence of it.' " (*Ibid.*)  Such a statement "is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. . . . [¶]  The threshold determination is whether the proffered statement is hearsay, i.e., whether it is being offered to prove the truth of its contents." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.)  If not, "the accuracy of the [statement] is irrelevant . . . what is important is not whether [the asserted facts were true] but that declarant *believes"* they were true.  (*Id.* at pp. 389–390.)  It follows, then, that if a declarant's statement is admitted as nonhearsay circumstantial evidence of the declarant's state of mind, the admission of that evidence is not subject to Evidence Code section 1252, which disallows the admission if made under circumstances that indicate its lack of trustworthiness.  (*People v. Dalton* (2019) 7 Cal.5th 166, 232.)

3. *Standard of Review*

We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  We will not reverse a court's ruling unless the trial court exercised its discretion " 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Jones* (2017) 3 Cal.5th 583, 609.)

C.  *Analysis*

We agree with the trial court that the text was inadmissible.  Although our theory of exclusion differs from that of the trial court, "we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm." (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

The trial court relied on the definition of hearsay in Evidence Code 1250 and the state of mind exception. We agree with appellant's contention that the statement was not offered for its truth, and thus was not hearsay, but instead was presented as circumstantial evidence of his state of mind. Specifically, as he explains on appeal, the state of mind reflected in the post-shooting text was his belief "he was at risk of being uncovered." The trustworthiness of the statement under Evidence Code 1250 was thus immaterial to its admissibility.

But we agree with the People that appellant's fear of being outed as a "snitch" two days *after* the drive-by shooting was not relevant to prove or disprove any disputed fact of consequence to the trial. (Evid. Code, § 210.) Appellant's statement to Bamba shed no light on whether appellant had the specific intent to commit murder, to aid and abet a murder, or to agree with others to commit murder on August 12. (See, e.g., *People v. Pearson* (2013) 56 Cal.4th 393, 458, 460–461 [rule of completeness did not require that the jury hear certain additional excerpts from the defendant's confession because his subsequent expressions of remorse were not relevant to his state of mind at the time of the murders].)

Appellant contends that his post-shooting state of mind was relevant because it suggested appellant "continued to associate with the others out of fear of being revealed as an informant," and thus could lead a jury to conclude that, at most, he agreed to aid and abet an assault, but never intentionally agreed to aid a murder. We are not persuaded. Nothing about the post-shooting text message indicates appellant continued to associate with members of the EDMC gang *after* the shooting to keep up an illusion that he was loyal. Even if it did, nothing about it supports the notion that

14

appellant would go as far as assaulting someone to maintain such a deception but would draw the line at murder.

To the extent his fear of being exposed as an informant was material to the question of his specific intent to commit the charged crimes, such evidence of his statement of mind would be relevant *before* the shooting. Both appellant and the People presented evidence regarding the pressures of appellant's dual role as gang insider and police informant. This included a conversation in March 2021, in which Bamba reassured appellant they would handle his court case in "the best way to go about it regarding your homies" so they would not find out he was working as an informant. Bamba explained, "We're very careful taking care of our peeps." Appellant responded that no one would find out from him because he was "really careful with what I do."

The defense introduced without objection additional statements by appellant expressing the precariousness of his situation. In February 2021, Bamba asked for information but appellant put him off because he was "around a bunch of homies." In March 2021, appellant explained he was trying to get court paperwork "so I can show my homies I kept my mouth shut. It would really make all my homies know for sure ain't nothing going on with me, you know. Because I didn't say shit when they had arrested us." In October 2021, appellant explained to Bamba that he could not talk because he was around people and it was not safe for him to communicate.

In March 2022, appellant apologized to Bamba, explaining "Sorry, I've been around homies, and they've been on my phone and shit calling people or using it for social media. So I had to block your number just to avoid any type of issues." The detective responded, "No worries. You run it as safe as you can."

15

The following week, appellant explained, "Homies been sleeping at my house, so it's been dangerous even trying to text." Days later appellant said, "It's been hot lately for me. The homies for some reason just think someone been talking or working for the police. I don't know how or why, but I can't risk being put out there." He explained he did not want others "to be suspicious or anything when I ask what happens and shit" and asserted "I gotta be safe." Days later appellant told Bamba, "it's gonna be too risky to talk when I'm there, but I'll try . . . ."

In June, appellant explained that he was trying to find some information for Bamba, "but it's hard without being burnt," which Bamba explained meant being found out to be an informant.

The month before the shooting, in July, appellant explained to Bamba, ". . . it's a lot of accusations coming up again from people saying they think I'm a snitch. . . . I just don't wanna put my family in danger so u guys probably won't hear from me for a while, it's a dangerous game I'm playing with you guys, and I'm still trying to low-key run the street life."

All of this evidence supported the defense appellant claims he wanted to present at trial: that at the time the shooting occurred, appellant's need to "low-key" run the street life, not get "burnt," "run it as safe as [he could]," and protect his family from danger meant he would continue to associate with the gang and engage in low-level crimes but never intended to commit the murder on August 12, 2022. The post-shooting text did not add to this theory.[6]

---

[6]     In light of this other evidence of appellant's state of mind introduced at trial without objection, even if we found exclusion of the post-shooting text erroneous, such error was harmless.

The rule of completeness does not alter the result. Nothing about the post-shooting text was necessary to correct a misleading impression left by the earlier discussion between appellant and Bamba on August 12 about likely retaliation for the Curtis murder or appellant's claimed lack of knowledge about the Stewart-Jordan murder. To the extent appellant volunteered information about the Bahia shooting, Bamba responded by saying he would be in touch. The post-shooting text, which appellant initiated, in any case offered no information about the Bahia shooting.

The court did not abuse its discretion in excluding the post-shooting text as circumstantial evidence of his state of mind or under the rule of completeness.

II. *Sufficiency of Gang Enhancement and Special Circumstances Evidence*

Appellant contends there was insufficient evidence that the alleged predicate crimes commonly benefited the gang in a way that was more than reputational.[7]

A. *Additional Background*

Appellant waived jury trial on the gang enhancements and special circumstances. At a bifurcated proceeding the People offered the following four predicate offenses.

---

[7] Appellant does not challenge other requirements of the predicate offenses, such as the timing of the offenses or whether they were committed on separate occasions or by two or more members. (§ 186.22, subd. (e)(1).) He also does not contest that the offense of conviction was itself carried out to further the activities of the criminal street gang (§ 186.22, subd. (b)), other than to argue that because the predicate offenses had not been proven, the People had not proved that EDMC was a criminal street gang under section 186.22 subdivision (b) and thus the enhancement at section 186.22 subdivision (b) and special circumstance at section 190.2 subdivision (a)(22) could not be satisfied.

1. *Assault by Appellant and Three Others on Massey*

Pursuant to a warrant, SDPD Investigator Ryan Siemer examined a social media account and discovered a video showing EDMC members appellant, Haile, Pittman, and E.W. repeatedly hitting and kicking Massey. The encounter took place in February or March of 2022, at a location on 44th Street.

SDPD Gang Detective Sabakhan Sharrieff testified that EDMC followed traditions among Crip gang sets. The "traditional" way to join was to be "jumped in" to the gang. Active gang members attack the person, and the person is encouraged to fight back to demonstrate their strength and fearlessness.

Sharrieff explained that there are two purposes for the jump-in: first, to see if the person is tough enough to actually fight, and second, to create cohesion or brotherhood within the gang. The gang might reject someone who performed poorly at the jump-in.

After the assault, appellant identified Massey in June 2022 as an active member of EDMC.

Sharrieff opined that "jump-ins" commonly benefited the gang in a manner that was more than reputational. Specifically, Sharrieff testified: "As a result [of the jump-in], the member went from associate to member. This increases the number of active members within that gang, which helps them defend themselves against rivals. Also, the fact that the individual went through this type of rite of passage gives legitimacy and [cohesion] within the group so that they continue with the traditional way of bringing members in."

## 2. *Randall Williams's Possession of a Firearm While on Patrol Around EDMC Headquarters*

SDPD Gang Detective Andrew Longen testified that on May 12, 2020, he was conducting surveillance of a residence on the 44th block in City Heights, known to him to be the headquarters of EDMC. He observed Randall Williams, whom he knew to be a member of EDMC, and appellant standing in the driveway of the residence. Williams and appellant walked together up 44th Street, headed north to Olive Street, east on Olive, south on Highland and then back to 44th Street. They headed in the opposite direction of appellant's parked car and not in the direction of any convenience store.

Patrol officers made contact with appellant and Williams as they were walking in the middle of 44th Street. As the officers approached, appellant and Williams moved from the middle of the street to the sidewalk. Appellant stopped for the officers but Williams kept walking. As he did so, Williams tossed aside a loaded revolver that he had been carrying. Williams subsequently pleaded guilty to being a felon in possession of a firearm.

Logan opined that two members walking around their gang headquarters and territory as appellant and Williams were doing were "basically conducting surveillance or patrol of their area, their turf," which benefits them "because they have to protect their turf." One gang member's possession of the firearm benefited the gang because "firearms are used by gang members to also go into their rival territories and shoot or cause harm to rival gang members." They also use firearms to commit robberies and sell narcotics. They can also pass off guns to other gang members "if there is a shooting that needs to happen or a crime they want" to be done.

19

### 3. *Possession of Numerous Firearms by Pittman and Delmond Parker*

In August 2020, Detective Longen was monitoring the social media accounts of EDMC member Pittman.  Pittman posted a video that depicted Delmond Parker, another EDMC member, dancing while carrying a MAC-10 firearm.  Longen saw a different photograph on social media showing Pittman carrying a revolver.  Pittman and Parker were both prohibited from possessing firearms.

Based on his observations of both Pittman and Parker in possession of firearms, Longen obtained and executed a search warrant at Pittman's home, where both Pittman and Parker lived.  In Parker's bedroom, officers found a nine-millimeter handgun.  In Pittman's bedroom officers found two unserialized ghost AR-15 guns under the bed, ammunition in a shoebox in the closet, a revolver that looked like the gun Pittman had in the photo, and the MAC-10 that Parker carried while dancing in the video.  Pittman and Parker each pleaded guilty to unlawful possession of a firearm.

Based on a hypothetical mirroring these facts, Longen opined that "[h]aving this much firepower for the gang, they can use these weapons to target rival gang members, they can use these weapons to protect their home turf, they can also use these weapons to commit other crimes such as robberies or burglaries or to protect themselves as they sell narcotics, which, again, is a tangible effect. They will get monies back from these types of crimes, being able to put money on the books of members that are in jail, buy Airbnbs, rent cars, get studio time for their rappers to be able to post videos on YouTube."  He added that it is common for gang members to share firearms with each other, and having these weapons stored at a house made them easily accessible to pass to fellow gang members.

### III. *The Trial Court's Findings*

The trial court considered the expert testimony, the characteristics of the charged drive-by shooting, and evidence at trial about EDMC's use of firearms. The court found, "[t]he evidence clearly showed that having ready access to guns was a critical part of being in this gang well beyond reputation." The court determined that the firearm convictions of E.W., Pittman and Parker qualified as predicates. The court did not make findings as to the jump-in video, but accepted the defense's concession that it qualified as a predicate.

In support, the court cited the expert testimony of the benefit to the gang, that "gang members need to be armed to provide security, to engage in assaults with firearms and/or murders." The court suggested that walking around your hood with a concealed firearm benefitted the gang since it means, "you are, by definition, protecting your turf when you are walking in your area."

In the leadup to the drive-by shooting, the court noted, the gang's "shot caller is telling these gang members, 'You gotta go out and do this right away.'" The court found, "They needed arms, multiple arms, and we know that more than one firearm was shot out of that vehicle by Crip members." Possessing guns, "particularly AR-15's, these high-capacity firearms, when the crime—the underlying crime is a drive-by shooting, circumstantially this gang needed ready, available firearms at all times."

Addressing the defense's argument that the prior gun possession convictions could not have supplied the guns for the current offense, the court explained that the drive-by shooting circumstantially showed "[t]his gang retaliates with firearms, and so having one readily available, if you need to go do a hit immediately, that was a benefit to this gang in 2020, 2021 [or] 2022"

21

when the predicate firearm possession offenses occurred. The court cited, in addition, "the discussions in the evidence about [appellant] talking with other fellow gang members about acquiring guns, having guns to secure candlelight vigils and things of that nature."

A. *Legal Principles*

The Penal Code provides enhanced punishment for someone "convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members[.]" (§ 186.22, subd. (b)(1); *People v. Clark* (2024) 15 Cal.5th 743, 751–752 (*Clark*).) The Legislature first enacted section 186.22 in 1988 as part of what is known as the STEP Act. (*Clark*, at p. 751.) In 2021, the Legislature substantially amended the STEP Act in Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 1.) (*Clark*, at p. 752.) The new legislation, which became effective on January 1, 2022, made several changes to the statutory definitions relating to gang enhancements in section 186.22.

The legislative history of Assembly Bill No. 333 indicated "the Legislature was concerned with 'lax' interpretations of the prior law that allowed for overly expansive application of gang enhancements (Stats. 2021, ch. 699, § 2) and therefore sought to amend the law by 'making the standards for applying a gang enhancement more rigorous.' " (*People v. Cooper* (2023) 14 Cal.5th 735, 744–745 (*Cooper*).)

As now more narrowly defined, a "criminal street gang" is an "ongoing, organized association or group of three or more persons" that: (1) has a common name or common identifying sign or symbol; (2) has, as one of its primary activities, the commission of the offenses listed in section 186.22, subdivision (e)(1); and (3) whose members collectively engage in or have

22

engaged in a pattern of criminal gang activity. (§ 186.22, subd. (f).) To establish a pattern of criminal gang activity, the People must prove at least two predicate offenses. (§ 186.22, subd. (e)(1).) These offenses must meet the following requirements: (1) the offenses must have commonly benefited a criminal street gang; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206; § 186.22, subd. (e)(1), (2).)

Assembly Bill 333 also "narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any common benefit be more than reputational." (*Clark, supra*, 15 Cal.5th at p. 752; § 186.22, subd. (g).) Examples of such benefits "include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Not every crime committed by gang members results in a common benefit to the gang, much less one that is more than reputational. (See *Cooper, supra*, 14 Cal.5th at p. 743.) To understand the kind of evidence needed to satisfy the requirement that each predicate offense provide a common benefit to the gang that is more than reputational, we find instructive several cases recently decided by our Supreme Court.

In *Cooper, supra*, 14 Cal.5th 735, the court noted "the grand total of evidence relied on by the Attorney General for proving that the alleged predicate offenses provided a common benefit that is more than reputational to the gang is that there was a robbery and a sale of narcotics by gang

members and that a primary activity of the gang is to commit robberies and the sale of narcotics." (*Id.* at p. 746.) The record in that case, however, did "not disclose the circumstances surrounding the predicate offenses and the prosecution never introduced any evidence about how the gang commonly benefited from them. While robbery and the sale of narcotics typically provide a financial benefit to the *offender*, the record contains evidence that could rationally lead to a contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole*," as opposed to for each offender's personal gain alone. (*Id.* at pp. 743–744.)

The Supreme Court reversed a gang enhancement allegation for instructional error in *People v. Lamb* (2024) 16 Cal.5th 400, 451 (*Lamb*) because "other than general testimony concerning how gang members could benefit the gang through criminal acts, there was no other evidence 'about how the specific predicate offense actually benefited the gang.'" The court found that because there was no evidence as to how the predicate offenses, including certain financial crimes, "actually provided a common benefit that was more than reputational," the instructional error was prejudicial and the jury's true findings on the gang enhancements had to be reversed for retrial. (*Lamb*, at p. 451.)

In *People v. Hin* (2025) 17 Cal.5th 401, 461 (*Hin*), the prosecution presented evidence of three predicate offenses: sale of a controlled substance, burglary and murder. (*Hin*, at p. 462.) The prosecutor's gang expert "testified that the types of crimes alleged as predicate offenses . . . could have offered both reputational and non-reputational benefits to a gang. For example, she testified that gang members may generate revenue for the gang by engaging in 'drug sales,' 'stealing cars,' and 'burglaries.'" (*Id.* at p. 463.) The expert did not testify, however, "as to whether the specific alleged predicate offenses

of drug sale or burglary benefited [the gang] as a whole, and the record [was] otherwise silent as to the circumstances of those two predicate offenses." (*Ibid*.)  Since the evidence did "not show that either crime was committed for the benefit of the gang rather than for personal gain . . . , a rational juror could have concluded that [those] two predicate offenses 'were committed for personal gain alone.' " (*Ibid*.)  The court therefore could not say the instructional error was harmless.  (*Ibid*.)

We recognize that *Cooper*, *Lamb,* and *Hin* involved instructional error rather than sufficiency of the evidence, but we nevertheless find the Supreme Court's reasoning helpful.  As we read these cases, it is not enough that a crime committed by gang members could *theoretically* confer a common benefit on the gang that is more than reputational.  Rather, there must be some evidentiary basis for the trier of fact to find that the gang *actually* received a common benefit from the predicate crime.

In assessing a claim of insufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Albillar, supra,* 51 Cal.4th at pp. 59–60.)  We presume every fact in support of the judgment that could have reasonably been deduced from the evidence.  (*Id*. at p. 60.)  If the circumstances reasonably justify the court's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*Ibid*.)

B. *Analysis*

Because the court accepted the defense's concession that the "jump-in" qualified as a predicate, and appellant did not challenge that finding in his

opening brief on appeal,[8] we need only examine whether substantial evidence existed in the record from which a factfinder could conclude that one additional offense actually conferred a common benefit on the gang in a way that was more than reputational.

We conclude that Williams's firearm conviction satisfies that requirement. Substantial evidence supported the trial court's view that an armed patrol of EDMC territory provided the common benefit of protecting gang turf. The testimony of the detective and the conviction documents sufficiently established that Williams and appellant were circulating their block in a manner consistent with gang members conducting an armed patrol around areas claimed by EDMC. The two emerged from EDMC headquarters on 44th Street, walked down 44th Street, north to Olive, east on Olive, south on Highland, and back to 44th. They did not head towards any stores or to appellant's car. They circled the block together, overtly displaying their presence and control over the area to insiders and outsiders. Williams's possession of a concealed and unregistered firearm during this patrol allowed them to better defend the turf, the detective explained.

Evidence at trial further supported the trial court's conclusion that the gang derived non-reputational benefit from armed patrol by its members. Appellant described how he armed himself with an AR to patrol a candlelight vigil for a murdered gang member, to ensure they wouldn't "get caught slippin' "—allowing a rival to disrupt the remembrance or harm the mourners

8      In his reply brief, appellant for the first time argued that the "jump-in" did not meet the elements of section 245, because the video depicted mutual, and not non-consensual, physical contact. A contention may ordinarily not be raised for the first time in a reply brief. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1206.) We decline to consider this argument.

due to lack of vigilance. The gang retaliated for such disrespectful acts, the evidence showed, as when EDMC shooters killed a Brim in retaliation for the removal of a homie's headstone.

Appellant argues that the evidence instead showed that Williams possessed the weapon for self-defense, which was a personal benefit and not a common benefit to the gang. The other benefits described by the gang detective were not supported by evidence, appellant argues. It was merely speculative that Williams would use the gun to shoot rivals, commit crimes, or pass the gun to another gang member.

Here, unlike in the cases cited by appellant, the expert testified to the actual common benefit to the gang of Williams's firearm possession during a patrol of the gang's turf. Evidence at trial corroborated the trial court's conclusion about the common benefit to the gang from armed turf patrols. Unlike *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199, Williams possessed the gun within gang territory and was walking with another gang member in a manner consistent with patrolling the gang's turf, which, the gang expert explained, provided a common benefit to the gang as a whole. And unlike *People v. Ramon* (2009) 175 Cal.App.4th 843, 849, 851 and *People v. Soriano* (2021) 65 Cal.App.5th 278, 289, where evidence did not sufficiently establish that possession of weapons by individual gang members benefitted the gang as a whole, here the overt and intentional patrolling activity engaged in by William and appellant, and expert testimony regarding the importance of defending the gang's territory against rivals, supplied substantial evidence for the court's conclusion.

## IV. *Remand for Fines and Fees*

Finally, parties agree that the case must be remanded for the court to order fines and forfeiture amounts on the record. This concession is proper and we accept it.

The probation report recommended a $10,000 restitution fine (section 1202.4, subd. (b)), a $10,000 parole revocation fine (section 1202.45), and an $80 court security fee (section 1465.8). The sentencing minute order and the abstract of judgment reflect these amounts.

But the transcript does not reflect that the court ordered appellant to pay these fines and fees. The trial court is responsible for determining the fines and fees and its oral pronouncement controls over any inconsistent minute order. (*People v. El* (2021) 65 Cal.App.5th 963, 967.)

We remand to the trial court for resentencing to determine the fines and fees and order them on the record. We assume the court will apply all applicable rules in doing so, including the rule that no parole revocation fine shall be imposed if the defendant is sentenced to life without parole. (§ 1202.45; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.)

## DISPOSITION

The judgment is affirmed with the exception of the imposition of fines and fees, which is ordered stricken. The matter is remanded for the court to determine fine and fees. The clerk of the court is to amend the abstract of judgment to include any changes made by the court and forward a certified copy to the department of corrections and rehabilitation.

O'ROURKE, Acting P. J.

WE CONCUR:

BUCHANAN, J.

KELETY, J.

29